Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

        *Plaintiff*,

   v.

IRVIN BETHEA,

        *Defendant*.

Crim. No. 90-328

**OPINION**

**John Michael Vazquez, U.S.D.J.**

     This matter comes before the Court by way of Defendant Irvin Bethea's *pro se* motion for compassionate release. D.E. 59. Thereafter, counsel entered an appearance on Bethea's behalf and submitted a supplemental brief. D.E. 94. The Government filed opposition, D.E. 97, to which Bethea replied, D.E. 100. Defendant argues that he should be released because of COVID-19 and his hypertension, obesity, asthma, and scoliosis. Both sides also address the Section 3553(a) factors. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). For the following reasons, Defendant's motion is denied.

---

[1] Defendant's brief in support of his motion is referred to as "Br." (D.E. 59); Defendant's supplemental brief is referred to as "Supp." (D.E. 94); the Government's opposition brief is referred to as "Opp." (D.E. 97); and Defendant's reply brief is referred to as "Reply." (D.E. 100). The remaining submissions will be referred to by their docket entry ("D.E.") number.

I.  BACKGROUND

A. Underlying Criminal and Post-Trial Proceedings

In March 1987, law enforcement began investigating a street gang, the "E-Port Posse," led by Bilal Pretlow. Presentence Investigation Report ("PSR") ¶¶ 45, 56. The E-Port Posse distributed large quantities of cocaine and marijuana in Elizabeth and Linden, New Jersey, among other areas. *Id.* ¶ 47. The group obtained multi-kilogram quantities of cocaine and then cut, packaged, and distributed the cocaine through street dealers, known as "clockers." *Id.* ¶¶ 58, 64. The gang protected its business through violence and threats of violence. *Id.* ¶ 55. The group regularly recruited juveniles to package cocaine at stash houses and then sell the drugs; children who refused to do so were often threatened and, at times, beaten. *Id.* ¶¶ 53; 64-66. In May 1989, Pretlow held a meeting with fellow drug dealers in Linden, New Jersey. *Id.* ¶ 68. Pretlow informed the others that he intended to be the principal drug distributor in Elizabeth and that the other dealers should align with him. *Id.* Drug dealers who refused to join were threatened, attacked, and/or killed. *Id.* ¶ 69.

Bethea was Pretlow's "right hand man." *Id.* ¶ 71. For example, during the May 1989 meeting, Bethea did most of the talking, informing the other dealers that all would be provided with cocaine and that they were "family." *Id.* Pretlow's supervisory duties included overseeing and collecting money from clockers, and installing a telephone in a residence to conduct narcotics transactions. *Id.* ¶ 72. On November 25, 1988, Bethea was arrested at a local motel along with two other Posse members, Corey Grant and Vincent Jackson. *Id.* ¶ 73. A resulting search revealed 2 kilograms of cocaine and over $70,000 in cash. *Id.*

At trial, the Government introduced evidence that Bethea was involved in a murder. In 1989, the E-Port Posse learned that one of its members, Mutah Sessoms, was cooperating with law

enforcement. On June 16, 1989, Grant picked Sessoms up and drove him to an apartment in East Orange, New Jersey. Once there, Pretlow and other gang members confronted Sessoms about his cooperation while pointing firearms at him. Sessoms was assaulted, with Grant putting Sessoms in a choke hold; Bethea then hit Sessoms in the head with a hammer. Robert Pretlow (Bilal's brother) then killed Sessoms with a machete. Sessoms' body was cut into pieces. Grant went with Bilal Pretlow to buy suitcases for various body parts to be hidden in and disposed of.

Bethea, along with numerous other members of the E-Port Posse, were indicted. The Government sought the death penalty against Bilal Pretlow, so his case was severed. While Pretlow's case was underway, he killed himself. Bethea then went to trial with co-defendants Grant and Jackson. On May 13, 1992, Bethea was convicted by a jury of the following: (1) Count One – Racketeer Influenced Corrupt Organization ("RICO") conspiracy in violation of 18 U.S.C. § 1962(d); (2) Count Two - RICO of racketeering acts seven a and b (conspiracy with intent to distribute controlled dangerous substances ("CDS") and possession with intent to distribute CDS) and act nine (possession with intent to distribute CDS) in violation of 18 U.S.C. § 1926(c); (3) Count Four – conspiracy to distribute and possess with intent to distribute in violation of 21 U.S.C. § 846; and (4) Count Six – possession with intent to distribute CDS in violation of 21 U.S.C. § 841(a)(1). *Id.* ¶¶ 38-42. As to Count Two, Bethea was acquitted of act three (the murder of Melanie Baker), and the jury could not reach a verdict on act one (the murder of Sessoms). *Id.* ¶¶ 6, 37-42.

The RICO conspiracy covered March 1, 1987 until January 1, 1990. *Id.* ¶ 1. At the time the conspiracy started, Bethea was 16 and he was 19 when it ended. Bethea was also 18 when he committed Count Six.

The PSR calculated Bethea's United States Sentencing Guidelines' range as follows: the base offense level was 34 because the offense involved fifteen to fifty kilograms of cocaine, a 2-level increase was added because Bethea possessed a weapon during the offense, and an additional 3 levels were added because Bethea was a supervisor of at least five participants, resulting in a total offense level of 39. *Id.* ¶¶ 88-99. With a criminal history category of III, Bethea faced a guidelines' range of 324 to 405 months. *Id.* ¶¶ 123, 129. The Government, however, contended that the offense level should be 43 because it had proved by a preponderance of the evidence that Bethea was involved in the murder of Sessoms. *Id.* at 23. A level 43 required a life sentence.

When he was sentenced federally, Bethea was already serving a fifteen-year state term due the November 25, 1988 activity at the hotel. *Id.* ¶ 116. On December 1, 1992, the Honorable Harold A. Ackerman, U.S.D.J., sentenced Bethea to life imprisonment on each of Counts One and Two and 30 years on each of Counts Four and Six. D.E. 94-1 at 3-6. All sentences ran concurrently. *Id.*

Judge Ackerman recognized the magnitude of the Government's assertion that a level 43 applied: "The difference between exposures, though numerically small, is qualitatively great. If Mr. Bethea is sentenced under an offense level of 39, he may see the light of day again. If sentenced under an offense level of 43, he will not." *Id.* at 50. The court then found by clear and convincing evidence that Sessoms had been cooperating with law enforcement since November 1988; following charges at the state level, members of the E-Street Posse were provided with a copy of Sessom's statement to law enforcement that reflected his cooperation; on June 16, 1989, Grant drove Sessoms to an apartment in East Orange, New Jersey; Bethea was present with a M-16 machine gun; Bethea pointed his weapon at Sessoms; Grant put Sessoms in a choke hold; Bethea struck Sessoms in the head with a hammer; Robert Pretlow next chopped Sessoms' neck

4

with a machete; Sessoms body was then placed in a bathtub so that it could be cut into pieces; Bethea and others began to clean the apartment; and Bethea helped carry suitcases with Sessoms' remains to a car, after which Bilal Pretlow and Grant scattered the suitcases around Newark. *Id.* at 50-53. Judge Ackerman observed that "[w]ere I the trier of the (sic) fact in this case[,] I would have found beyond a reasonable doubt that Mr. Bethea murdered Mutah Sessoms." *Id.* at 56. As a result, the court applied offense level 43. *Id.* Judge Ackerman ruled, alternately, that if he was only permitted to consider the actual offenses for which Bethea was convicted, the court would apply an upward departure to level 43. *Id.* at 56-61. Judge Ackerman found that the "murder of Sessoms was brutal, degrading, sadistic, and gratuitous," while noting that Bethea demonstrated a complete "lack of remorse." *Id.* at 60.

Bethea's conviction and sentence were affirmed on appeal. *United States v. Bethea*, 6 F.3d 780 (3d Cir. 1993), *cert. denied*, 510 U.S. 1061 (1994). Bethea indicates that his first petition for *habeas corpus* was dismissed. *Grant v. United States*, No. 06-5952, 2008 WL 360982 (D.N.J. Feb. 8, 2008). Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which rendered the guidelines advisory, Bethea sought to file a second petition. The Third Circuit denied the request. *In re Bethea*, No. 06-1221 (3d Cir. Feb. 28, 2006) ("[T]he Supreme Court has not made *Booker* retroactively applicable to cases on collateral review.").

Bethea is currently housed in USP McCreary.

### B. COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." *COVID-19*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Feb. 26,

5

2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/overview/index.html#background. "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death). *Id.* As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *COVID-19*, "Older Adults," Centers for Disease Control and Prevention (May 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk of severe illness than people in their fifties. *Id.* Those 85 or older are at greatest risk. *Id.* Adults 65 or older comprise 8 out of 10 COVID-19 deaths in the United States. *Id.* The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic liver diseases, chronic lung diseases (including asthma if it is moderate to severe), cystic fibrosis, dementia or other neurological conditions, diabetes, certain disabilities, HIV infection, immunocompromised state, certain mental health conditions, obesity, pregnancy, physical inactivity, sickle cell disease, smoking, solid organ or blood stem cell transplant, stroke or cerebrovascular disease, substance use disorders, and tuberculosis. *COVID-19*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (last update Feb. 25,

2022),[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

As of May 16, 2022, the United States has had 82,301,126 COVID-19 cases, resulting in 997,083 deaths. *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited May 16, 2022).

A. **Federal Bureau of Prisons**

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action Plan." *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.* Contractors who enter any BOP facility are screened for the virus and, initially, admission was limited to contractors who performed essential services. *Id.* The BOP also conducts enhanced health screenings for staff in areas of "sustained community transmission." *Id.* The BOP screens all new inmates for virus "exposure risk factors and symptoms." *Id.* Any new inmate who is asymptomatic but has had a risk of exposure is quarantined. *Id.* According to the Government, the quarantine period is for a minimum of 14 days or until cleared by medical staff. Opp. at 4. The Government indicates that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff. *Id.* at 5. The Government also states that the BOP has taken the following steps to prevent the spread of the virus: group gatherings are limited to permit social

---

[2] The CDC previously provided two separate lists, one listing conditions that entailed a greater risk of severe illness and one setting forth conditions that might involve a greater risk.

7

distancing as much as possible, all staff and inmates have been issued face masks, and all staff and inmates are strongly encouraged to wear face masks when social distancing cannot be achieved. *Id.*

The BOP also has a COVID-19 vaccination plan. *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Mar. 11, 2021), https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. Inmates fall into different priority levels for vaccination: Priority Level 1 (for inmates in certain high priority jobs, including health service unit assignments); Priority Level 2 (inmates who are 65 or older or who are, according to CDC criteria, at an increased risk for severe illness from the virus); Priority Level 3 (inmates who are aged 50 through 64 or who might be, according to CDC criteria, at an increased risk for severe illness from the virus); and Priority Level 4 (all other inmates). *Id.* As of May 16, 2022, the BOP had administered 316,976 doses of vaccine. *COVID-19*, "Vaccine Implementation," Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp (last visited May 16, 2022).

The BOP COVID-19 current statistics are as follows: (1) 115 inmates and 204 staff presently have confirmed positive tests; (2) 51,852 inmates and 12,631 staff have recovered; and (3) 295 inmates and 7 staff have died. *Id.* USP McCreary, where Defendant is housed, currently reports 0 inmate and 0 staff cases. *Id.* In addition, 283 inmates and 145 staff have recovered, and two inmates have died. *Id.*

### C. The Parties' Arguments

Defendant is 51 years old and indicates that he suffers from obesity, asthma, hypertension, and scoliosis. Br. at 1. Defendant contends that his sentence is unconstitutional because he was

8

sentenced to life imprisonment for offenses he committed while a juvenile.[3]  *Id.* at 6-7.  Bethea also states that COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like him.  *Id.* at 8-11.  He asserts that, as a result, his ability to provide self-care in the correctional facility is substantially diminished and he suffers from health conditions from which he is not expected to recover.  *Id.* at 11.  Bethea also claims that the Section 3553(a) factors support his release.  *Id.* at 12.  Defendant explains that his rehabilitation efforts justify his immediate release. *Id.* at 14.  He states that he is a tutor, a mentor, and an Inmate Suicide Watch Companion.  *Id.* Bethea continues that he has not had serious disciplinary infractions in nearly fifteen years and that he has worked in many different jobs while incarcerated.  *Id.* at 15.  He adds that he has completed numerous vocational and educational courses as reflected in his over 2,500 hours of participation in the courses.  *Id.* at 15-16.  Defendant asks to be reunited with his ailing mother, his two children, and his grandchildren.  *Id.* at 17.

      In his supplemental brief, Bethea notes that at the time of his sentencing, the guidelines were mandatory and that his age ordinarily could not be considered in fashioning an appropriate sentence.  Supp. at 2, 12-14.  He notes that he was not convicted of the murder of Sessoms.  *Id.* at 10.  Defendant emphasizes that his age at the time of the offense is a mitigating circumstance.  *Id.* at 11-12.  In support, Bethea points out that recent neuroscientific evidence and legal decisions indicate that the human brain continues to develop into the mid- to late-20s; that the majority of adolescents naturally grow out of risky or criminal conduct; and that young people have an underdeveloped sense of responsibility, leading to recklessness and impulsivity.  *Id.* at 11-12.

---

[3] Bethea was both a minor and an adult during the course of the RICO conspiracy.  Bethea has not cited to any precedent to support his argument that his sentence was unconstitutional as to his factual situation.  Nor could the Court locate any such authority.  As a result, the Court finds that this argument lacks merit.  The Court does, however, discuss below Bethea's age at the time of the offenses.

(citations omitted). He also reiterates the impact of the pandemic and the affect that it has had on prison conditions. *Id.* at 15-18. Bethea adds that the Section 3553(a) factors support his release. *Id.* at 19-23. While noting that he was not convicted of murder, Bethea observes that his sentence was much higher than the average murder sentence in 2019 and 2020. *Id.* at 19. He continues that empirical research demonstrates no relationship between sentence length and deterrence; that he has not had any disciplinary incidents since 2014; that he has obtained his GED; that he has complete 82 classes in varied areas (vocational, personal development, crafting, and educational); and that he has worked as a suicide watch companion. *Id.* at 20-22. Bethea adds that he has maintained familial relationships; that he has a viable release plan; that he was raised in a poor area plagued by drugs; and that he is overweight. *Id.* at 22-23.

The Government opposes Defendant's motion, arguing that Defendant has not shown extraordinary and compelling reasons to justify his release. Opp. at 7. The Government asserts that Bethea's age at the time of the offenses cannot justify his release because that fact was known at the time of his sentencing. *Id.* at 10. The Government adds that a purely discretionary life sentence, as Bethea received, is not unconstitutional even as to minors. *Id.* (citing *Jones v. Mississippi*, - U.S. -, 141 S. Ct. 1307 (2021)). *Id.* The Government continues that Defendant's offenses in no way reflect youthful impulsivity. *Id.* As to COVID-19, the Government asserts that the argument is invalid because Bethea has refused to be vaccinated, because USP McCreary has a high vaccination rate (89%), and the facility currently has no positive cases. *Id.* at 11-13. The Government notes that Bethea's medical records do not reflect any of his claimed medical conditions and that he is overweight but not obese. *Id.* at 5, 16-17. As to the Section 3553(a) factors, the Government posits that the nature and circumstances of Bethea's offenses weigh heavily against him as does the fact that he still expresses no remorse and was under court

supervision while committing the RICO offenses. *Id.* at 18-20. Finally, the Government argues that releasing Bethea now would represent a significant sentencing disparity when compared with Grant, who is serving 65 years. *Id.* at 22.

In reply, Bethea asserts that the Government's argument is flawed because neuroscience advances reflect new, material evidence and because his age generally could not have been considered at the time of his sentencing under the then-mandatory guidelines. Reply at 2-3. He adds that impulsivity is not the only relevant trait in young adults and points to susceptibility to outside influences. *Id.* at 3. Bethea next reiterates the conditions of confinement that were exacerbated by the pandemic. *Id.* at 4-6. Bethea also points to sentencing disparities in light of the average murder sentence and the fact that Grant may actually be released, despite being convicted murder and attempted murder. *Id.* at 6-7. Defendant concludes that his steady rehabilitative efforts also support his request. *Id.* at 7.

## II.     LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), *after considering the factors set forth in section 3553(a)* to the extent that they are applicable, if it finds that—
>
> > (i) *extraordinary and compelling reasons warrant such a reduction*; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;
>
> *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and
>
> (2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added). The Government does not contest that Defendant has satisfied the statutory exhaustion requirement.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13. U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The application notes to the section provides four circumstances that can be considered extraordinary and compelling: (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons. *Id.* cmt. n. 1(A)-(D). In *United States v. Andrews*, 12 F.4th 255, 259-60 (3d Cir. 2021), the Third Circuit found that the policy statement was not binding on courts but nevertheless found that the statement could provide useful guidance.

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a). They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant. *Id.*

### III. ANALYSIS

The Court finds that Bethea has not met his burden of demonstrating extraordinary and compelling reasons to justify his release. The Court also finds that Bethea has failed to show that the Section 3553(a) factors support his release.

Turning first to Defendant's arguments concerning the pandemic, Bethea declined to be vaccinated. As a result, this Court joins the numerous other courts who have found that such a decision demonstrates that a defendant has voluntarily foregone an opportunity for self-care offered by the BOP. *See, e.g.*, *United States v. Baeza-Vargas*, No. Cr-10-00448, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (listing more than a dozen decisions reaching the same result). Defendant has not provided any medical reason for refusing; he simply refused. *See United States v. Jackson*, No. 07-40-2, 2021 WL 1145903, at *2 (E.D. Pa. Mar. 25, 2021). Defendant is within his rights to refuse the vaccine, but any corresponding argument that he must be released because of potential complications were he to contract the virus rings hollow. *United States v. Jackson*, No. 15-cr-260(7), 2021 WL 806366, at *1-2 (D. Minn. Mar. 3, 2021).

In addition, while Bethea claims to have certain conditions (such as obesity and asthma) that could put him at greater risk should he contract the virus, he fails to adequately establish that he actually has those conditions. Moreover, USP McCreary has a higher vaccination rate than that of the United States as a whole, and the facility currently has no positive cases. For the foregoing

reasons, Bethea's arguments as to the pandemic do not reflect extraordinary and compelling reasons.

As to Bethea's age at the time of the offenses, he appears to argue the issue as both an extraordinary and compelling reason as well as a Section 3553(a) factor. *Compare* Supp. at 2 ("[C]ourts have the authority (indeed, the obligation) to consider factors such as a defendant's youth in determining the minimally sufficient sentence to satisfy the statutory sentencing factors.") *with* Supp. at 10 ("One 'extraordinary and compelling' circumstance weighing heavily in favor of a sentence reduction is Mr. Bethea's age at the time of the offense."). The Court analyzes Defendant's age as an extraordinary and compelling reason, but the Court's analysis would be the same under a Section 3553(a) review.

Before turning to the substantive analysis, the Court must first determine whether it can consider Bethea's age at the time of the offenses. The Government says no, while Defendant says yes. The Court agrees with Defendant. When Bethea was sentenced, the guidelines were mandatory and age normally could not be considered at sentencing. U.S.S.G. § 5H1.1 (1992) ("Age (including youth) is not ordinarily relevant in determining whether a departure is warranted."); *see also United States v. Shoupe*, 929 F.2d 116, 120 (3d Cir. 1991) ("Although this policy statement[, Section 5H1.1,] does not completely prohibit departures based upon age, it proscribes such departures except in extraordinary circumstances."). Thus, while the Government is correct that Defendant's age was known at the time of his sentencing, the argument misses the point. As a matter of law, his age normally could not have been considered in fashioning the appropriate sentence. And while the Court is aware that *Booker* has not been made retroactive to cases on collateral appeal, the Government points to no similar limitation in the First Step Act vis-à-vis a defendant's age. To the contrary, the Third Circuit has implicitly, if not expressly, approved

14

a court's consideration of a defendant's age at the time of the underlying crimes in a First Step Act motion.

In *United States v. Andrews*, 12 F.4th 255, 257 (3d Cir. 2021), the defendant was serving a sentence of 312 years for thirteen armed robberies that he committed when he was 19. While the defendant was unable to take advantage of a non-retroactive change in the First Step Act to 18 U.S.C. § 924(c) (which would have reduced his sentence by about 221 years), he was able to seek relief under Section 3582(c)(1)(A) of the Act. *Id.* The *Andrews* court concluded that the district judge had not erred when he concluded that the duration of the sentence and the non-retroactive change could not amount to extraordinary and compelling reasons under the Act. *Id.* at 260-62. The court in *Andrews*, however, also noted the following:

> But in holding that the statutorily required sentence or Congress's nonretroactive sentencing reductions are not extraordinary and compelling reasons for purposes of § 3582(c)(1)(A), we are not saying that they are always irrelevant to the sentence-reduction inquiry. If a prisoner successfully shows extraordinary and compelling circumstances, the current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors.

*Id.* at 262 (citations omitted).

The Third Circuit found no error in the lower court's consideration of the defendant's age at the time of his offenses:

> The court recognized that Andrews was arrested at a relatively young age and that, since that time, he has taken great strides in his rehabilitation—he regularly attends church, he's had a clean disciplinary record in prison since 2013, and he helped develop a charitable program to benefit the Salvation Army. . . . The court then explained that, although Andrews's age and rehabilitation could both be viewed as extraordinary, those reasons by themselves were insufficiently compelling to warrant a reduced sentence. Thus, the court denied Andrews's motion for compassionate release.

15

*Id.* (citations omitted). Thus, the Court concludes that it is permissible to consider Bethea's age at the time of his offenses in evaluating whether Bethea has shown extraordinary and compelling circumstances.

The Court finds that Bethea has not demonstrated that his age at the time of his offenses equates to an extraordinary or compelling reason to justify his release. Bethea's offenses took place over the course of nearly three years. Thus, the Court agrees with the Government that Bethea's activity was not the result of impulsivity. Bethea responds that the Court must also consider Bethea's susceptibility to the outside influence of others. Although Bethea fails to make a sufficient factual record in this regard, the Court assumes that Bilal Powell did exert influence over Bethea and others in the commission of the offenses. At the same time, Bethea was not a lowly foot soldier in the organization. Instead, he was Powell's "right hand man." That means that Bethea had a supervisory role and exercised influence over the gang. Indeed, Bethea's responsibilities included oversight of the "clockers"—who were for the most part also minors, many of whom were forced to work for the organization. This means that Bethea also took advantage of the age of other younger participants. Finally, Bethea was also an adult during a portion of the conspiracy and racketeering activities.

The remaining Section 3553(a) factors also do not support Bethea's release. While imprisoned, Bethea has taken affirmative steps towards rehabilitation: he has obtained his GED, he has completed numerous educational and vocational courses,[4] and he has served in the suicide watch program. These positive steps, however, do not surpass the seriousness of Bethea's offenses. As noted, he was a supervisory member of a dangerous drug gang. He participated in

---

[4] While Bethea's coursework count in his favor, the Court also agrees with the Government that completing on average less than three classes per year and less than 84 hours per year does not reflect an extraordinary effort.

16

the organization's illegal activities for several years. Defendant points out that the average murder sentence is less than the imprisonment term imposed. Defendant also notes that he was not convicted of murder by the jury. But Bethea has not shown that Judge Ackerman's findings as to Bethea's involvement in Sessoms' murder were erroneous or inappropriate. And it was a particularly gruesome, premeditated murder in retribution for Sessoms' cooperation. More importantly, Bethea was convicted of long-running racketeering activity, in which his organization distributed tremendous amounts of illicit drugs and imposed its will through violence and threats of violence. Finally, to date, Bethea has not expressed any sincere remorse for his involvement in the long-running criminal activities.

## IV.     CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion. An appropriate Order accompanies this Opinion.

Dated:  May 17, 2022

_____
John Michael Vazquez, U.S.D.J.